NO. 10-17755

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

RICHARD STENGEL; MARY LOU STENGEL,

Plaintiffs-Appellants,

v.

MEDTRONIC INCORPORATED, a foreign corporation,

Defendant-Appellee.

---

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

No. 4:10-cv-00318-RCC
The Honorable Raner C. Collins
United States District Court Judge

---

## AMICUS CURIAE BRIEF OF THE STATES OF IDAHO, MONTANA, NEVADA, OREGON, WASHINGTON AND THE OFFICE OF CONSUMER PROTECTION OF HAWAII SUPPORTING APPELLANTS

---

ROBERT M. MCKENNA
Attorney General of Washington

ELIZABETH ERWIN
Assistant Attorney General
WSBA No. 16548
800 5th Ave, Suite 2000
Seattle, WA 98104
(206) 587-4289

Lawrence G. Wasden
Attorney General of Idaho
700 W. Jefferson Street,
Suite 210
P.O. Box 83720
Boise, Idaho 83720-0010
(208) 334-2400

Ellen F. Rosenblum
Attorney General of Oregon
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 378-4400

Steve Bullock
Attorney General of Montana
Montana Department of Justice
P.O. Box 201401
Helena, Montana  59620-1401
(406) 444-2026

Bruce B. Kim
Executive Director, Office of
Consumer Protection
235 South Beretania Street,
Suite 801
Honolulu, Hawaii 96813
(808) 586-2630

Catherine Cortez Masto
Attorney General of Nevada
555 E. Washington Ave
Suite 3900
Las Vegas, Nevada 89101
(702) 486-3420

# TABLE OF CONTENTS

I.     IDENTITY OF AMICI CURIAE ...................................................1

II.    INTEREST OF AMICUS CURIAE ...............................................1

III.   ISSUE OF AMICUS CURIAE .......................................................1

IV.    ARGUMENT ...............................................................................2

       A.  Implied Preemption Should Not Apply to State Consumer
           Protection Laws ...................................................................2

       B.  There Is No Clear and Manifest Purpose of Congress in the
           MDA to Preempt Parallel State Consumer Protection Laws And
           Enforcement Actions. ...........................................................4

       C.  The Decision May Incorrectly Preempt State Enforcement
           Actions .................................................................................6

       D.  State Consumer Protection Efforts Would Bolster, Rather Than
           Conflict With, FDA Enforcement ........................................10

V.     CONCLUSION ...........................................................................16

# TABLE OF AUTHORITIES

## Cases

*Aguayo v. U.S. Bank*,
  653 F.3d 912 (9th Cir. 2011)............................................................ 4

*Bates v. Dow Agrosciences LLC*,
  544 U.S. 431, 125 S. Ct. 1788, 161 L. Ed. 2d 687 (2005)............................ 16

*Beerman v. Toro Mfg. Corp.*,
  1 Haw. App. 111, 615 P.2d 749 (1980)............................................... 7

*Buckman Co. v. Plaintiffs' Legal Committee*,
  531 U.S. 341, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001)................. 9, 10, 13

*Eastlake Const. Co., Inc. v. Hess*,
  102 Wn.2d 30, 686 P.2d 465 (1984) ................................................ 7

*Graham v. Kold Kist Beverage Ice, Inc.*,
  43 Or. App. 1037, 607 P.2d 759 (1979)............................................. 7

*Hillsborough Cty. v. Automated Med. Labs., Inc.*,
  471 U.S. 707, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985) ............................. 3

*In re Edwards*,
  233 B.R. 461 (Bankr. D. Idaho 1999) .............................................. 7

*Koscot Interplanetary, Inc. v. Draney*,
  90 Nev. 450, 530 P.2d 108 (1974) ................................................. 7

*Maryland v. Louisiana*,
  451 U.S. 725, 101 S. Ct. 2114, 68 L. Ed. 2d 576 (1981) ............................. 3

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996).................... passim

*Rohrer v. Knudson*,
  349 Mont. 197, 203 P.3d 759 (2009) ............................................... 7

*Rice v. Santa Fe Elevator Corp.,*
  331 U.S. 218 (1947) ...................................................................... 3

*Riegel v. Medtronic Inc.,*
  552 U.S. 312, 128 S. Ct. 999, 169 L. Ed. 2d 892 (2008) ............................ 4, 9

*See Freightliner Corp. v. Myrick,*
  514 U.S. 280, 115 S. Ct. 1483, 131 L. Ed. 2d (1995) .................................... 6

*Stengel v. Medtronic Inc.,*
  676 F.3d 1159 (9th Cir. 2012) .................................................... 9, 11, 14, 15

*Wyeth v. Levine,*
  555 U.S. 555, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009) ......................... 2, 15

<u>Statutes</u>

21 U.S.C. § 332 .................................................................................. 12

21 U.S.C. § 333(a) ............................................................................. 12

21 U.S.C. § 333(f)(1)(A) ................................................................... 12

21 U.S.C. § 334(a)(2)(D) ................................................................... 12

21 U.S.C. § 360k(a) ............................................................................. 4

Idaho Code Ann. §§ 48-601 through 48-619 .................................... 1

Nev. Rev. Stat. § 598.0903 *et seq* .................................................... 1

Or. Rev. Stat. § 646.605 *et seq.* ....................................................... 1

Wash. Rev. Code § 19.86 .................................................................. 1

Wash. Rev. Code § 19.86.080 ........................................................... 1

Wash. Rev. Code § 19.86.080(1) ....................................................... 6

Other Authorities

Denise Grady, *Many Defibrillators Implanted Unnecessarily, Study Says*,
    N.Y. TIMES (Jan. 4, 2011),
    http://www.nytimes.com/2011/01/05/health/05device.html ........................ 14

*Hip Replacement Surgery: Demographics*, SURGERY.COM (Nov. 24,
    2009), http://www.surgery.com/procedure/hip-replacement-
    surgery/demographics. ................................................................... 14

http://www.fda.gov/downloads/ICECI/EnforcementActions/UCM247845.
    pdf; U.S. Food and Drug Admin., *FY 2009 Enforcement Statistics*,
    http://www.fda.gov/ICECI/EnforcementActions/ucm247827.htm (last
    visited Aug. 13, 2012) ................................................................... 12

Kennedy-White Orthopaedic Center, *New Options In Knee Replacement
    Surgery*, PRNEWSWIRE.COM (June 20, 2012),
    http://www.prnewswire.com/news-releases/new-options-in-knee-
    replacement-surgery-159737585.html ......................................... 14

U.S. Food & Drug Admin., *Warning Letters*,
    http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/default
    .htm (last visited Aug. 10, 2012) ................................................. 12

U.S. Food and Drug Admin, *The Releasable PMA Database*,
    *downloadable at*
    http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/De
    viceApprovalsandClearances/PMAApprovals/default.htm#pma (last
    visited Aug. 13, 2012) ................................................................... 13

U.S. Food and Drug Admin., *About the Center for Devices and
    Radiological Health*, http://www.fda.gov/MedicalDevices/default.htm
    (last visited Aug. 13, 2012). ......................................................... 12

U.S. Food and Drug Admin., *FY 2011 Enforcement Statistics (PDF –
    314KB)* (Jan. 4, 2012),
    http://www.fda.gov/downloads/ICECI/EnforcementActions/UCM28578
    1.pdf ............................................................................................. 12

## Rules

Fed. R. App. P. 29(a) ........................................................................... 1

## Regulations

21 C.F.R. § 808.1 ................................................................................. 6

21 C.F.R. section 801.430(b)-(d) ....................................................... 4

# I.     IDENTITY OF AMICI CURIAE

The States of Idaho, Montana Nevada, Oregon, and Washington, the Office of Consumer Protection of Hawaii submit this amicus curiae brief pursuant to Fed. R. App. P. 29(a).

# II.     INTEREST OF AMICUS CURIAE

The panel's unwarranted departure from Supreme Court precedent and its overly broad application of implied preemption undermine the States' authority to enforce state consumer protection laws addressing deceptive marketing practices by medical device manufacturers. The States have a strong interest in the enforceability of their duly enacted laws protecting consumers. *See* Wash. Rev. Code § 19.86.080 (Attorney General may bring actions under the Consumer Protection Act to restrain unfair and deceptive practices).[1]

# III.     ISSUE OF AMICUS CURIAE

The panel majority erred in holding that the plaintiffs' state law claims premised on Medtronic's violations of FDA regulations are impliedly preempted by the Medical Device Amendments of 1976 to the Food, Drug, and Cosmetic Act (MDA). By holding parallel claims (state law claims based on a violation of FDA regulations) are impliedly preempted, the panel's decision may prevent States from

---

[1] The consumer protection laws of some of the amici States are found at Wash. Rev. Code § 19.86; Or. Rev. Stat. § 646.605 *et seq.*; Idaho Code Ann. §§ 48-601 through 48-619; Nev. Rev. Stat. § 598.0903 *et seq.*

enforcing positive state laws that address marketing tactics, misrepresentations, and failures to warn by medical device manufacturers who violate FDA regulations and state consumer protection laws. Because many such claims are enforced under state law, which operates parallel to the MDA, the panel's decision effectively removes important and necessary remedies for harms caused by medical device manufacturers who fail to abide by FDA regulations and refrain from deceptive marketing. The decision could leave significant numbers of consumers who have been injured by medical devices without legal remedies against manufacturers who have not complied with FDA regulations and orders. That result is not what Congress intended in the MDA.

## IV.   ARGUMENT

### A.    Implied Preemption Should Not Apply to State Consumer Protection Laws

In all preemption cases—and especially in those cases involving a field in which the States have traditionally occupied—courts "start with the assumption that the historic police powers of the States were not to be superseded" by Congress unless that was Congress' "clear and manifest purpose." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996) (citations omitted). *See also Wyeth v. Levine*, 555 U.S. 555, 565 n.3, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009) (clarifying that this presumption also applies in implied preemption cases). Courts should presume that Congress does not intend to

2

displace state law.  *See*, *e.g.*, *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S. Ct. 2114, 68 L. Ed. 2d 576 (1981) ("Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law."); *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985) (recognizing "the presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause").  This presumption stems from the centrality of federalism and dual sovereignty in our system of government.  Precluding a State from regulating in an area within the State's sovereignty is a grave act that should not casually be attributed to Congress.  "Because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action."  *Lohr*, 518 U.S. at 485.

This presumption against preemption is particularly strong and compelling where the state law concerns traditional areas that fall within the States' police power, such as health and safety laws.  *Lohr*, 518 U.S. at 485 (citing *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)).  This strong presumption applies here because consumer protection and public health and safety are areas that have been traditionally occupied by the States.  *Id.* at 475 ("States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" because these are traditionally and

3

historically matters of local concern.); *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011) (Consumer protection laws "fall in an area that is traditionally within the state's police powers to protect its own citizens.").

**B.    There Is No Clear and Manifest Purpose of Congress in the MDA to Preempt Parallel State Consumer Protection Laws And Enforcement Actions.**

The clearly manifested Congressional purpose behind the MDA was "to provide for the safety and effectiveness of medical devices intended for human use." *Lohr*, 518 U.S. at 490 (quoting 90 Stat. 539). As part of its effort to achieve that goal, Congress expressly preempted the establishment of conflicting *state requirements*[2] with regard to medical devices:

> no State . . . may establish . . . with respect to a device intended for human use any requirement (1) which is different from, or in addition to, any requirement applicable under [the FDCA], and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under [the FDCA].

21 U.S.C. § 360k(a). The Court flatly rejected the argument that this provision also preempts *state remedies*. *Lohr*, 518 U.S. at 486-91. The holding was clarified in *Riegel v. Medtronic Inc.*, 552 U.S. 312, 128 S. Ct. 999, 169 L. Ed. 2d 892

---

[2] Some examples of specific requirements regarding a medical device are as follows: (1) the FDA requires tampon manufacturers to include specific warnings about Toxic Shock Syndrome in their packaging; (2) the FDA requires that contact lens solutions be able to kill certain bacteria before they can be labeled as "disinfecting solution." 21 C.F.R. section 801.430(b)-(d); Guidance for Industry: Premarket Notification (510(k)) Guidance Document for Contact Lens Care Products.

(2008). The Court held that "[s]tate requirements are pre-empted under the MDA only to the extent that they are 'different from, or in addition to' the requirements imposed by federal law." *Id.* at 330. The MDA "does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case 'parallel,' rather than add to, federal requirements." *Id.*

While *Lohr* and *Riegel* addressed only state common law remedies—and while only common law remedies are directly at issue in the case at bar—the same principles apply to state consumer protection statutes that provide remedies for violations of the FDA regulations implementing the MDA.

The FDA's regulations similarly interpret the scope of preemption to extend only to state requirements that specifically contradict FDA requirements with regard to a particular device:

> State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements. There are other State or local requirements that affect devices that are not preempted by section 521(a) of the act because they are not "requirements applicable to a device" within the meaning of section 521(a) of the act. The following are examples of State or local requirements that are not regarded as preempted by section 521 of the act:

(1) Section 521(a) does not preempt State or local requirements of general applicability *where the purpose of the requirement relates either to other products in addition to devices . . . or to unfair trade practices in which the requirements are not limited to devices.*

21 C.F.R. § 808.1 (emphasis added).  The regulations reflect Congress's intent *not* to preempt laws of general applicability such as (1) state statutes addressing products in general (not just medical devices) that require manufacturers to give notice of dangerous conditions, and (2) state statutes prohibiting unfair and deceptive marketing tactics.

The panel held that the Stengel's failure-to-warn claims are impliedly preempted by the MDA.  Congressional intent with regard to express preemption, as demonstrated in the regulations above and in *Lohr* and *Reigel*, necessarily informs the scope of implied preemption.  It would defy reason to argue that Congressional intent supports the implied preemption of an area that has been explicitly carved out as *not* expressly preempted.  *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 288, 115 S. Ct. 1483, 131 L. Ed. 2d (1995) ("[A]n express definition of the pre-emptive reach of a statute 'implies'—*i.e.*, supports a reasonable inference—that Congress did not intend to pre-empt other matters.").

## C.  The Decision May Incorrectly Preempt State Enforcement Actions

To provide consumer protections to its citizens most States authorize actions brought in the name of the State to enforce state consumer-protection statutes.  *See, e.g.*, Wash. Rev. Code § 19.86.080(1) ("The attorney general may bring an action

in the name of the state, or as *parens patriae* on behalf of persons residing in the state, against any person to restrain and prevent" acts of unfair and deceptive competition.).  The purpose of these consumer protection laws is to "complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition."  *See*, *e.g.*, *Eastlake Const. Co., Inc. v. Hess*, 102 Wn.2d 30, 53, 686 P.2d 465, 477 (1984).[3]

---

[3] All amici States have similar laws and similar purposes.  For example, Idaho's consumer protection law is remedial legislation intended to deter unfair and deceptive trade practices and to be construed liberally.  *In re Edwards*, 233 B.R. 461, 470 (Bankr. D. Idaho 1999) (citing Idaho Code Ann. § 48-603).  Oregon's consumer protection law was enacted to protect consumers, rather than businesses. *Graham v. Kold Kist Beverage Ice, Inc.*, 43 Or. App. 1037, 1040, 607 P.2d 759, 761 (1979) (citing Or. Rev. Stat. Ann. § 646.605).  Describing Nevada's consumer protection law, the Nevada Supreme Court explained, "It is not only a right but the duty of a state to protect its citizens from injurious activities in commercial and business affairs by regulation through its police power.  Even a legitimate occupation may be restricted or prohibited in the public interest, and contracts adversely affecting that interest may be restrained."  *Koscot Interplanetary, Inc. v. Draney*, 90 Nev. 450, 456, 530 P.2d 108, 112 (1974) (in the context of fraudulent misrepresentation and a pyramid scheme contrary to Nev. Rev. Stat. § 598.120). The legislative history [of Hawaii's consumer protection statutes] makes clear that the paramount purpose of both statutes is to prevent deceptive practices by businesses that are injurious to other businesses and consumers. *Beerman v. Toro Mfg. Corp.*, 1 Haw. App. 111, 118, 615 P.2d 749, 754 (1980).  "We hold as a matter of law that an unfair act or practice is one which offends established public policy and which is either immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *Rohrer v. Knudson*, 349 Mont. 197, 205, 203 P.3d 759, 764 (2009).

7

On behalf of the public, the States' Attorneys General police unfair business practices, including deceptive marketing practices in the health care arena.[4] To fulfill the mission of consumer protection laws, this enforcement power has included in the past—and should continue to include—enforcement against

_____

[4] For example, in the last five years, the Washington State Attorney General's Consumer Protection Division sued the following drug companies, in conjunction with counterpart divisions in the Attorney General offices of other States, for violations of consumer protection laws: *State v. Abbott Laboratories*, King County Superior Court Cause No.12-2-16319-7, Seattle, Washington, settled by consent decree; judgment for $2,015,447; *State v. Astrazeneca Pharmaceuticals LP and Astrazeneca LP* King County Superior Court No. 11-2-09386-7, Seattle, Washington, settled by consent decree, judgment for $1,612,265; *State of Washington v. Bayer Corporation*, King County Superior Court No. 0-7-2-03323-8, Seattle, Washington, settled by consent decree, Judgment for $200,229; *State v. Caremark Rx, LLC*; *State v. Eli Lilly and Company*, King County Cause No. 08-2-34390-1, Seattle, Washington, settled by consent decree, Judgment for $1,612,417; *In re: Express Scripts, Inc.*, Thurston County Cause No. 08-2-01255-4, Olympia, Washington, settled by Assurance of Discontinuance, $470,500; *State v. GlaxoSmithKline LLC and SB Pharmco Puerto Rico, Inc.*, King County Cause No. 11-2-21739-6, Seattle, Washington, settled by consent decree, $1,001; *In re: Merck & Co., Schering-Plough Corporation, MSP Singapore Company, LLC*, Thurston County Cause No. 09-2-01728-7, Olympia, Washington, settled by Assurance of Discontinuance, payment of $100,000; *State v. Pfizer, Inc.*, King County Cause No. 08-2-36289-2, Seattle, Washington, settled by consent decree, judgment of $1,018,193; *State v. Pfizer, Inc.*, King County Cause No. 09-2-330085-9, Seattle, Washington, settled by consent decree, judgment of $807,997; *In the Matter of: Warner-Lambert, LLC*, Thurston County Cause No. 04-2-00966-6, Olympia, Washington, settled by Assurance of Discontinuance, payment of $285,006; *State v. Merck & Co., Inc.* King County Cause No. 08-2-17107-8, Seattle, Washington, settled by consent decree, judgment for $1,638,727; *State v. Purdue Pharma L.P.*, Thurston County Cause No. 07-2-00917-2, Olympia, Washington, settled by consent decree, judgment for $720,217; *State v. Berkley Premium Nutraceuticals*, King County Superior Court Cause No. 6-2-00426-1, Olympia, Washington, settled by consent decree; judgment for $25,000; *State v. Guidant Corporation*, King County Superior Court Cause No. 07-2-28585-7SEA, Seattle, Washington, settled by consent decree; judgment for $390,000; *State v. Airborne Health, Inc.*, King County Superior Court Cause No. 08-2-42958-0, Seattle, Washington, settled by consent decree; judgment for $150,000; *In re: Electric Mobility Corporation*, Thurston County Superior Court Cause No. 7-2-02504-6, Olympia, Washington, settled by assurance of discontinuance; judgment for $15,407.

8

medical device companies that engage in unfair competition when such conduct is predicated on violations of FDA regulations and deceptive marketing practices that violate state consumer protection laws. Enforcement of these consumer protection laws do not add to federal requirements in the MDA but are "parallel" to them. *Riegel*, 552 U.S. at 330.

Even though the panel in this case addressed only common law remedies, its holding that the Stengels' failure-to-warn claims are impliedly preempted by the MDA potentially has implications for state consumer protection actions. That holding could be understood to suggest that States are impliedly preempted from enforcing their unfair competition laws based either on violations of FDA regulations or on deceptive marketing conduct that may overlap or be related to conduct addressed in the regulations.

The majority's decision found that failure to warn claims were impliedly preempted because policing of this area "is committed exclusively to the federal government" and recognizing state causes of action would conflict with federal enforcement efforts. *Stengel v. Medtronic Inc.*, 676 F.3d 1159, 1164 (9th Cir. 2012). Primarily relying on *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 347, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001), the panel majority failed to even consider or discuss the strong presumption against preemption that is afforded

state enforcement of health and safety and consumer protection laws and effect that such a presumption should have on its analysis.

*Buckman* is not determinative of the case at hand. It involved a fraud-on-the-FDA claim based on the manufacturer's alleged fraudulent statements to the FDA made to obtain device approval. *Buckman* held that "[p]olicing fraud against federal agencies is hardly a field which the States have traditionally occupied," which distinguished it from cases implicating "the historic primacy of state regulation of matters of health and safety." *Buckman*, 531 U.S. at 347.

Unlike *Buckman*, the type of failure-to-warn claims alleged by the Stengels do not require the State to police fraud against the FDA. By seeking a remedy under a state tort law that creates a duty to warn of unreasonably dangerous products, these plaintiffs invoke traditional state tort law protections regarding health and safety. The panel majority failed to recognize that the present case differs significantly from *Buckman*. This case strongly implicates the States' historic powers to protect against and provide remedies for health injuries, *Lohr*, 518 U.S. at 485. The failure-to-warn claim asserts harms suffered by the plaintiffs that the FDA regulations are intended to prevent, not the type of agency interests that are presented in a fraud-on-the-FDA claim.

**D.    State Consumer Protection Efforts Would Bolster, Rather Than Conflict With, FDA Enforcement**

10

Moreover, the panel decision provides no support for its assumption that allowing state parallel claims (whether private tort claims or state law enforcement claims) predicated on violation of FDA regulations would conflict with Congressional objectives of the MDA. The panel merely points to the "detailed reporting requirements" for adverse events which also governs the warnings to be made to physicians. *Stengel* at 1164-65. This analysis fails to identify a clear and manifest Congressional purpose that would be defeated by state enforcement of the same area but also appears to be based on an implicit assumption of vigorous and consistent FDA enforcement that would be hindered by state enforcement. That assumption is unfounded.

The decision effectively eliminates private tort actions for a large class of devices and, as explained above, potentially may negatively impact state law enforcement efforts. It thus dramatically reduces consumer protections against harmful devices. Such a reduction in health and safety enforcement conflicts with the Congressional purpose and intent of the MDA to provide for the safety and effectiveness of medical devices intended for human use. *Lohr*, 518 U.S. at 490. The threat of FDA enforcement alone cannot provide the same deterrence and financial disincentives to device manufactures who engage in violations of FDA regulations and deceptive marketing tactics.

In enforcing its regulations, the FDA is empowered to seek injunctive relief, 21 U.S.C. § 332; seek civil penalties, 21 U.S.C. § 333(f)(1)(A); seize offending devices § 334(a)(2)(D) and pursue criminal prosecutions § 333(a). It also issues warning letters to manufacturers, which carry no penalties or other punitive effect, but merely seek a written response and voluntary compliance.[5]

According to FDA's own statistics regarding its enforcement actions, the agency made a total of only fifteen seizures out of *all regulated products in this country*, including pharmaceuticals and medical devices in 2011. *See* U.S. Food and Drug Admin., *FY 2011 Enforcement Statistics (PDF – 314KB)* (Jan. 4, 2012), http://www.fda.gov/downloads/ICECI/EnforcementActions/UCM285781.pdf.

The Center for Device and Radiological Health, (CDRH) the FDA division responsible for regulating all medical devices,[6] conducted only one seizure in 2011. For this same timeframe, the CDRH issued no injunctions for medical device enforcement and issued 175 warning letters.[7] In 2010, the CDRH made

---

[5] *See* U.S. Food & Drug Admin., *Warning Letters*, http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/default.htm (last visited Aug. 10, 2012).

[6] *See* U.S. Food and Drug Admin., *About the Center for Devices and Radiological Health*, http://www.fda.gov/MedicalDevices/default.htm (last visited Aug. 13, 2012).

[7] All FDA statistics are located in presentations which can be found at U.S. Food and Drug Admin., *Enforcement Activity,* http://www.fda.gov/ICECI/EnforcementActions/ucm247813.htm (last visited Aug. 13, 2012). *See* U.S. Food and Drug Admin., *FY 2011 Enforcement Statistics (PDF – 314KB)* (Jan. 4, 2012), http://www.fda.gov/downloads/ICECI/EnforcementActions/UCM285781.pdf; U.S.

only two seizures and issued only two injunctions, although it issued 204 warning letters. *Id.* (Data is not available for other years that include the breakdown of specific enforcement actions for medical devices.)

A comparison of these statistics with the numbers of just a few representative Class III medical devices currently in the marketplace illuminates the startling infrequency of FDA enforcement actions. Class III devices "presen[t] a potential unreasonable risk of illness or injury" and therefore receive the FDA's strictest review. *Buckman*, 531 U.S. at 345. At present, there are over 23,000 different premarket approved (PMA) Class III medical devices. U.S. Food and Drug Admin, *The Releasable PMA Database*, *downloadable at* http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DeviceApprovalsandClearances/PMAApprovals/default.htm#pma (last visited Aug. 13, 2012). All other Class III devices were approved through the less rigorous pre-market notification process, known as a 510(k) process.[8] As Judge Noonan notes in his dissent, the number of devices approved through the 510(k) process from 2000 to

---

Food and Drug Admin., *FY 2010 Enforcement Statistics (PDF – 65KB)* (March 16, 2011), http://www.fda.gov/downloads/ICECI/EnforcementActions/UCM247845.pdf; U.S. Food and Drug Admin., *FY 2009 Enforcement Statistics*, http://www.fda.gov/ICECI/EnforcementActions/ucm247827.htm (last visited Aug. 13, 2012).

[8] Class III devices may enter the market without premarket approval if they fall within the following two exceptions: (1) "grandfathered" devices that were on the market before 1976 when the MDA was passed and (2) devices substantially equivalent to theses pre-existing devices. *See, e.g.*, *Lohr*, 518 U.S. at 477-478.

2011 was *nearly four times* that of devices approved through the stringent PMA process. *Stengel*, 676 F.3d at 1168. That statistic suggests approximately 92,000 Class III medical devices have been approved under the 510(k) process, leading to a total of approximately 115,000 Class III medical devices currently on the market.

For each approved Class III device, there may be hundreds of thousands of devices sold per year. For example, about 100,000 heart defibrillators are implanted in the United States each year.[9] Approximately 270,000 knee replacements are done each year.[10] Between 200,000 and 300,000 hip replacements are performed each year.[11]

The enforcement statistics above demonstrate that in policing approximately 115,000 Class III devices implanted hundreds of thousands times per year, the FDA has performed only one or two seizures and obtained only one or two injunctions each year. It may issue a few hundred warning letters each year, but those letters merely request a written response and voluntary compliance. These are compelling statistics that show the need in the marketplace for complementary

---

[9] Denise Grady, *Many Defibrillators Implanted Unnecessarily, Study Says*, N.Y. TIMES (Jan. 4, 2011), http://www.nytimes.com/2011/01/05/health/05device.html.

[10] Kennedy-White Orthopaedic Center, *New Options In Knee Replacement Surgery*, PRNEWSWIRE.COM (June 20, 2012), http://www.prnewswire.com/news-releases/new-options-in-knee-replacement-surgery-159737585.html.

[11] *Hip Replacement Surgery: Demographics*, SURGERY.COM (Nov. 24, 2009), http://www.surgery.com/procedure/hip-replacement-surgery/demographics.

enforcement of FDA regulations and deceptive marketing practices through state law enforcement and private tort litigation.

Moreover, the statistics cited above negate the majority's implicit assumption that the FDA can conduct adequate enforcement and policing of this area. The panel majority concluded from the detailed reporting requirements regarding adverse event reporting and issuing warnings that the policing of this conduct "is committed exclusively to the federal government" and that state causes of action would conflict with these enforcement efforts. *Stengel*, 676 F.3d at 1164. While the panel majority appears to assume a robust and consistent enforcement regime hindered by conflicting state enforcement attempts, the reality borne out by these numbers is that private tort and state government enforcement of FDA regulations and medical device marketing practices provide a much needed supplementary policing of this area.

This reality has also been noted by the Supreme Court in *Wyeth v. Levine*, which highlighted and partially relied upon the FDA's limited resources in finding that state law enforcement with regard to certain drugs were <u>not</u> preempted. *See Wyeth*, 555 U.S. at 578-579 (noting the FDA's "limited resources to monitor the 11,000 drugs on the market"). The *Wyeth* court also noted that state-law actions often produce additional information about the risks of products, which assist federal regulators and might prompt manufacturers to address the problem. *See Id*.

15

at 579; *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 450–51, 125 S. Ct. 1788, 161 L. Ed. 2d 687 (2005).

The panel's decision effectively immunizes medical device manufacturers from private tort liability for a large category of medical devices and can be argued to prevent state government enforcement actions alleging violations of FDA regulations and deceptive marketing practices. Given the infrequency and the lack of punitive impact of most FDA enforcement measures, the decision significantly reduces, if not totally eliminates, the very incentives (to prevent harm and injury to consumers) Congress mandated in the MDA.

## V. CONCLUSION

For the reasons set forth above, the Amici States request that this Court set aside the panel's decision that state law failure-to-warn claims predicated on violation of FDA requirements against medical device manufacturers are impliedly preempted by the MDA.

RESPECTFULLY SUBMITTED this 15th day of August, 2012.

ROBERT M. MCKENNA
*Attorney General*

By: s/ *Elizabeth J. Erwin*
Elizabeth J. Erwin, WSBA No. 16548
Assistant Attorney General
Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104

16

## CERTIFICATE OF COMPLIANCE

## PURSUANT TO FED. R. APP. P. 32(c)(2) AND

## NINTH CIRCUIT RULES 35-4 AND 40-1(a)

I, Elizabeth J. Erwin, certify that pursuant to the Federal Rule of Appellate Procedure 32(c)(2) and Ninth Circuit Rules 35-4 and 40-1(a), the attached Amicus Curiae Brief of the States of Idaho, Montana, Nevada, Oregon, Washington and the Office of Consumer Protection of Hawaii is double spaced and was printed in proportionately spaced, fourteen-point Times New Roman type. It contains 3,652 words (per the Order dated August 2, 2012, briefs must not exceed 4,000 words). In preparing this Certificate, I relied on the word count generated from Microsoft Word 2007.

DATED: August 15, 2012

ROBERT M. MCKENNA
Attorney General of Washington


By: s/ *Elizabeth J. Erwin*
Elizabeth J. Erwin, WSBA No. 16548
Assistant Attorney General
Washington State Attorney
General 800 Fifth Avenue, Suite
2000 Seattle, WA 98104

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2012, I electronically filed the attached Amicus Curiae Brief of the States of Idaho, Montana, Nevada, Oregon, Washington and the Office of Consumer Protection of Hawaii with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by suing the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 15, 2012, at Seattle, Washington.

s/ *Elizabeth J. Erwin*
Elizabeth J. Erwin