*Case No. 10-17755*

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

RICHARD STENGEL; MARY LOU STENGEL,

*Plaintiffs-Appellants/Petitioners*

vs.

MEDTRONIC INCORPORATED,
a Minnesota Corporation

*Defendant-Appellee/Respondent.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
HONORABLE RANER C. COLLINS, DISTRICT JUDGE
Case No. 4:10-cv-00318-RCC

**BRIEF OF *AMICUS CURIAE* PRODUCT LIABILITY ADVISORY
COUNCIL, INC. IN SUPPORT OF DEFENDANT-
APPELLEE/RESPONDENT MEDTRONIC INCORPORATED**

**OF COUNSEL:**
Hugh F. Young, Jr.
Product Liability Advisory Council, Inc.
1850 Centennial Park Drive, Suite 510
Reston, VA 20191
(703) 264-5300

Alan J. Lazarus
Sally F. White
Drinker Biddle & Reath LLP
50 Fremont Street, 20th Floor
San Francisco, California  94105-2235
(415) 591-7500

*Attorneys for* Amicus Curiae *Product
Liability Advisory Council, Inc.*

# <u>TABLE OF CONTENTS</u>

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................1

INTEREST OF AMICUS CURIAE .................................................2

INTRODUCTION .......................................................................4

ARGUMENT .............................................................................7

    A.    In Enacting the Medical Device Amendments Act of 1976, Congress Intended to Establish a Federal Regulatory Relationship and Protect It Against the Disruptive Impact of State Law. ...............................................................................7

    B.    Implied Device Preemption ...............................................12

        1.    Even If a Claim is Not Expressly Preempted Under the MDA, it May Nevertheless be Impliedly Preempted. ...............12

        2.    Implied Preemption Under *Buckman* ...........................13

    C.    This Court Should Hold That State Law Failure to Warn Claims Premised on Violations of Federal Reporting Obligations are Preempted by *Buckman*. ...............................................16

        1.    The Stengels' Claims Based on Violations of MDR Requirements Exist Solely by Virtue of Those Requirements. ...............................................................16

        2.    State Attempts to Regulate the FDA/Entity Relationship Disrupt the "Delicate Balance" of the Federal Scheme. ............19

        3.    State Law Claims are Preempted by the MDA's "No Private Right of Enforcement" Provision. ...............................21

        4.    Finding State Law Tort Claims Premised on Violations of Federal Reporting Obligations Impliedly Preempted Will Not Result in the Consequences Judge Noonan Predicts. ...............................................................................23

    D.    This Court Should Adopt the Position of the Eighth Circuit and Reject the Analysis of the *Hughes* Decision. .......................25

CONCLUSION ........................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Biotics Research Corp. v. Heckler*
    710 F.2d 1375 (9th Cir. 1983) ...........................................................26

*Buckman Co. v. Plaintiffs' Legal Committee*
    531 U.S. 341 (2001).................................................................*passim*

*Cupek v. Medtronic, Inc.*
    405 F.3d 421 (6th Cir. 2005) ...........................................................18

*Desiano v. Warner-Lambert & Co.*
    467 F.3d 85 (2d Cir. 2006) .......................................................27, 28

*Dietary Supplemental Coalition, Inc. v. Sullivan*
    978 F.2d 560 (9th Cir. 1992) ...........................................................26

*Freightliner Corp. v. Myrick*
    514 U.S. 280 (1995).........................................................................12

*Garcia v. Wyeth-Ayerst Labs.*
    385 F.3d 961 (6th Cir. 2004) ...........................................................27

*Geier v. American Honda Motor Co.*
    529 U.S. 861 (2000).........................................................................12

*Hughes v. Boston Scientific Corp.*
    631 F.3d 762 (5th Cir. 2011) ......................................................*passim*

*In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*
    623 F.3d 1200 (8th Cir. 2010) ...........................................6, 13, 22, 25

*Lofton v. McNeil Consumer & Specialty Pharms*
    .672 F.3d 372 (5th Cir. 2012) ...........................................6, 20, 27, 28

*Medtronic, Inc. v. Lohr*
    518 U.S. 470 (1996).................................................................*passim*

*PLIVA, Inc. v. Mensing*
    131 S. Ct. 2567 (2011)........................................................................5

*Rice v. Santa Fe Elevator Corp.*
331 U.S. 218 (1947)........................................................................20

*Riegel v. Medtronic, Inc.*
552 U.S. 312 (2008)................................................................ *passim*

*Riley v. Cordis Corp.*
625 F. Supp. 2d 769 (D. Minn. 2009)..............................................13

*Silkwood v. Kerr-McGee Corp.*
464 U.S. 238 (1984)........................................................................15

*Warner-Lambert Co., LLC v. Kent*
552 U.S. 440 (2008)........................................................................28

*White v. Ford Motor Co.*
312 F.3d 998 (9th Cir. 2002) .........................................................17

## CALIFORNIA CASES

*Dowhal v. SmithKline Beecham Consumer Healthcare*
32 Cal.4th 910 (2004) ....................................................................21

## OTHER STATE CASES

*Readenour v. Marion Power Shovel, Inc.*
149 Ariz. 442 (1986).......................................................................17

*Wilson v. United States Elevator Corp.*
972 P.2d 235 (Ariz. Ct. App. 1998)................................................17

## STATUTES, RULES & REGULATIONS

21 C.F.R. § 803.50(a)........................................................................9

21 C.F.R. § 814.44(a)........................................................................9

21 C.F.R. § 814.84(b)(2)....................................................................9

21 U.S.C. § 337(a) ................................................................. *passim*

21 U.S.C. § 360c. ..........................................................................7, 8

21 U.S.C. § 360e ...............................................................................9

21 U.S.C. § 360h..............................................................................16

21 U.S.C. § 360k ........................................................................6, 10, 11, 13, 26

Federal Rule of Evidence 407 ...............................................................17

## **<u>CORPORATE DISCLOSURE STATEMENT</u>**

Pursuant to Rule 29(c) of the Federal Rules of Appellate Procedure, amicus state as follows:

The Product Liability Advisory Council, Inc. ("PLAC") is a non-profit association with no parent or subsidiary corporations.  No publicly held company owns 10% or more of its stock.

## <u>INTEREST OF AMICUS CURIAE</u>[1]

PLAC is a non-profit corporation with 100 corporate members, including manufacturers and sellers, representing a broad cross-section of American industry. A list of PLAC's current corporate membership is attached as Appendix A. Several hundred of the leading product liability defense attorneys in the country are sustaining (*i.e.*, non-voting) members of PLAC.

PLAC's primary purpose is to file *amicus curiae* briefs in cases with issues that affect the development of product liability law and impact PLAC's members. Since 1983, PLAC has submitted over 975 such briefs in state and federal courts.

PLAC's interest in this action arises from the profound impact on its members of state law claims seeking to impose obligations on manufacturers regulated by the FDA. As the Supreme Court has noted, in instances where manufacturers are subject to the detailed requirements of the FDA and not protected by preemption, they may be required to do business under the daunting specter of the varied requirements of 50 states' tort laws. *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 349-51 (2001). Consequences might include subjecting manufacturers to broader obligations than Congress intended, and inducing manufacturers to over-disclose out of an over-abundance of caution

---

[1] The parties have consented to the filing of this brief. No person other than *Amicus Curiae* or its counsel authored this brief in whole or in part, or made a monetary contribution to its preparation or submission.

fueled by concerns over imposition of liability under state law.  *Id.*  Better defining

what is and is not preempted under the federal regulatory scheme is a matter of

keen interest to device manufacturers.  This case implicates the "delicate balance"

of the FDA's regulatory scheme.  *Id.* at 348.  PLAC is interested in obtaining clear

guidance for its members on the reach of state law and its relationship to federal

obligations.

## **INTRODUCTION**

Plaintiffs-Appellants Richard and Mary Lou Stengel seek to recover monetary damages under Arizona state tort law for Defendant-Appellee Medtronic, Inc's alleged failure to report to the FDA certain information regarding the safety of its Class III medical device, a pain pump. The duty of a manufacturer to report regulatory information to the FDA is a component of the exclusively federal scheme established by Congress under the Medical Device Amendments Act of 1976 ("MDA"). But it is the federal government's job—and *only* the federal government's job—to police violations of the MDA, and to manage the regulatory relationship between the FDA and medical device manufacturers. Plaintiffs' effort to enforce exclusively federal requirements through application of Arizona tort law is preempted by 21 U.S.C. §337(a) and *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001).

The United States Supreme Court has thrice clarified the scope of preemption in the MDA context. In *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996), and *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008), the Court articulated the requirements for express preemption of state law claims under the MDA. In *Buckman*, the Court explained that state tort law may not be invoked to enforce provisions of the MDA and to intrude upon, and risk skewing the balance of, the inherently federal relationship between the FDA and those it regulates. There, the Court held that a state law tort claim premised on violations of MDA disclosure

requirements—"fraud-on-the-FDA"—threatened to disrupt the "delicate balance" struck among the various nuanced statutory objectives established by Congress in enacting the MDA.  It could also conflict with federal health policy by overwhelming the FDA's regulation of approved Class III medical devices, reducing the FDA's ability to control allocation of its own resources, inhibiting medical advancements and the availability of innovative medical products, and freely allowing juries to question, contradict, and undermine the careful regulatory determinations made by the FDA.  *See also PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2578 (2011) (characterizing *Buckman* as "holding that federal drug and medical device laws pre-empted a state tort-law claim based on failure to properly communicate with the FDA").

The Stengels assert state law claims which similarly threaten to intrude on the regulatory relationship between Medtronic and FDA, and interfere with federal policy objectives.  They allege the manufacturer failed to properly report safety information and corrective action taken to the FDA—quintessential claims for deceptive conduct in violation of the MDA.  From this nucleus, the claims go on to speculate that had the manufacturer timely and accurately reported accumulating risk information, the FDA would have reacted by requiring a warning to the medical community, which in turn would have timely induced Mr. Stengel's physicians to remove the device early enough to minimize the degree of inflammation sufficient to avoid his ultimate paralysis.

The District Court dismissed the Stengels' claims as preempted. The claims, which alleged the Medtronic pain pump should have been designed, manufactured, or labeled differently when sold, were found expressly preempted under 21 U.S.C. § 360k(a), as these claims sought to impose Arizona law requirements different from or in addition to those imposed by the FDA in the regulatory process. To the extent the Complaint sought to impose a damages remedy for the alleged failure to comply with the Medical Device Reporting ("MDR") requirements applicable to the pump, these were tantamount to "fraud-on-the-FDA claims" barred under *Buckman* and the doctrine of implied conflict preemption.

On appeal, the Ninth Circuit panel likewise concluded the Stengels' claims were all either expressly preempted by *Riegel* or impliedly preempted under *Buckman*. The panel noted a circuit split on whether state law failure to warn claims based on alleged MDR violations are preempted under *Buckman*. The panel sided with the Eighth Circuit (*In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200 (8th Cir. 2010)) and rejected the reasoning of the Fifth Circuit in *Hughes v. Boston Scientific Corp.*, 631 F.3d 762 (5th Cir. 2011), finding its reading of *Buckman* flawed and unpersuasive. *Hughes*' reading of *Buckman* is itself inconsistent with a more recent Fifth Circuit opinion (*Lofton v. McNeil Consumer & Specialty Pharms.*, 672 F.3d 372 (5th Cir. 2012)), which gave *Buckman* a broader, more practical, and more reasonable meaning.

Judge Noonan dissented, disagreeing with the majority's interpretation of *Buckman* and emphasizing the policy arguments opposing implied preemption. Judge Noonan's analysis of *Buckman* is flawed and his policy arguments are misplaced. In particular, Judge Noonan's argument, that applying *Buckman to* impliedly preempt state law failure to warn claims premised on violations of MDR requirements would eliminate all manufacturer liability for flaws in medical devices, essentially ignores or disagrees with the Supreme Court's preemption rationale expressed in *Buckman*, and overstates the impact of preemption. As such, it provides no legitimate or persuasive basis for reversal.

For all of these reasons, this Court should endorse the panel's analysis, and affirm.

## ARGUMENT

### A.   In Enacting the Medical Device Amendments Act of 1976, Congress Intended to Establish a Federal Regulatory Relationship and Protect It Against the Disruptive Impact of State Law.

Prior to passage of the MDA, 21 U.S.C. §§ 360c, *et seq.*, "the introduction of new medical devices was left largely for the States to supervise as they saw fit." *Riegel*, 552 U.S. at 315. The MDA represented a shift in which Congress "swept back some state obligations and imposed a regime of detailed federal oversight." *Id.* at 316.

That regime both featured and protected federal primacy over the safety and efficacy of important medical devices. Under the three-tiered system established

by the MDA, classifying medical devices by the risks they potentially present, the

more acute the safety issues, the greater the federal oversight, and the lesser the

tolerance for potential state interference.  Class III devices "receiv[e] the most

federal oversight" (*id.* at 317) and "the FDA's strictest regulation" (*Buckman*, 531

U.S. at 344) because they "present a potential unreasonable risk of illness or

injury."  21 U.S.C. § 360c(a)(1)(C)(ii)(II).  The inherent risks of these devices are

high because they are generally used where the likelihood of survival or normalcy

is otherwise low, and the device seeks to remedy serious pain or suffering.  *See,*

*e.g., Lohr*, 518 U.S. at 477 (Class III medical devices are those that either "'present

a potential unreasonable risk of illness or injury,' or which are 'purported or

represented to be for a use in supporting or sustaining human life or for a use

which is of substantial importance in preventing impairment of human health'")

(quoting § 360c(a)(1)(C)).  In other words, these devices are intended for patients

with serious conditions who need life-sustaining or life-altering treatments.

Examples of Class III devices include pacemakers, replacement heart valves,

implanted cerebella stimulators, and the internal pain pump implanted in Richard

Stengel's abdomen to control his debilitating pain.  *Id.* at 477; *Riegel*, 552 U.S. at

317; *Buckman*, 531 U.S. at 344.

Before they can be marketed, Class III devices must complete a "rigorous"

pre-market approval ("PMA") process, during which "[m]anufacturers must submit

detailed information regarding the safety and efficacy of their devices, which the

FDA then reviews, spending an average of 1,200 hours on each submission." *Lohr*, 518 U.S. at 477; *Buckman*, 531 U.S. at 344-45; *Riegel*, 552 U.S. at 317-18. In making the PMA determination, the FDA engages in an extensive cost-benefit analysis of the risks versus the safety and efficacy of the product. *See, e.g., Riegel*, 551 U.S. at 325. The PMA process also involves a review of the proposed labeling for safety and efficacy pursuant to the conditions on the label; to approve the device, the FDA must find the label is neither false nor misleading. *Id.* at 318. "Before deciding whether to approve the application, the agency may refer it to a panel of outside experts, 21 CFR § 814.44(a) (2007), and may request additional data from the manufacturer, § 360e(c)(1)(G)." *Id.*

If the device is approved, the manufacturer has continuing obligations to the FDA. "[T]he MDA forbids the manufacturer to make, without FDA permission, changes" to the device, including "design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness." *Riegel*, 552 U.S. at 319 (citing § 360e(d)(6)(A)(i)). Manufacturers of PMA devices are also subject to extensive FDA reporting requirements ("MDRs"), including:

> [I]nform[ing] the FDA of new clinical investigations or scientific studies concerning the device which the applicant knows of or reasonably should know of, 21 CFR § 814.84(b)(2), and to report incidents in which the device may have caused or contributed to death or serious injury, or malfunctioned in a manner that would likely cause or contribute to death or serious injury if it recurred, § 803.50(a).

*Id.* at 319-20.

Another requirement imposed on device manufacturers by the MDA is honesty and full disclosure in the required regulatory submissions. The FDA is "empowered to investigate suspected fraud. . . . In addition to the general criminal proscription on making false statements to the Federal Government, the FDA may respond to fraud by seeking injunctive relief and civil penalties; seizing the device; and pursuing criminal prosecutions." *Buckman*, 531 U.S. at 349 (internal citations omitted). These powers to punish and deter fraud by device manufacturers in their dealings with the FDA are "ample," and like all other enforcement authority conferred by the MDA, they are used by the FDA "to achieve a somewhat delicate balance of statutory objectives." *Id.* at 348. That balance "can be skewed by allowing fraud-on-the-FDA claims under state tort law." *Id.*

Accordingly, after creating this pervasive and intricate regulatory relationship between the FDA and manufacturers of Class III devices, Congress took steps to assure that this relationship would not be disrupted by the unpredictable influence of state law damages actions. Thus, the authority to enforce the MDA rests exclusively in the federal government. 21 U.S.C. § 337(a). Moreover, under the plain terms of the MDA, a state law requirement regarding a medical device, "which relates to the safety or effectiveness of the device," that is "different from, or in addition to, any requirement" under the MDA, is expressly preempted. 21 U.S.C. § 360k(a)(1)-(2); *see also Riegel*, 552 U.S. at 321-30. However, the Supreme Court in *Riegel* recognized that this preemption provision

left room for a narrow species of state law claims which impose *identical* state law

requirements.  Accordingly, "§ 360k does not prevent a State from providing a

damages remedy for claims premised on a violation of FDA regulations; the state

duties in such a case 'parallel,' rather than add to, federal requirements." *Riegel*,

552 U.S. at 330.[2]  Therefore, such parallel claims are not *expressly* preempted.

However, as discussed below, *Buckman* recognized that claims which may not be

barred by express preemption are still subject to dismissal based on principles of

implied conflict preemption; for example, where those claims are premised on

having misled the FDA.

---

[2] PLAC believes all of the Stengels' state law claims are expressly preempted by the MDA, including the failure to warn claim based on failing to report to the FDA.  The failure to report to the FDA warning claim is not a parallel claim.  Plaintiffs' theory only *starts* with a violation of the duty to report—the causal linkage additionally requires a certain FDA response (authorizing an alert to the medical community) and then requires further action by the manufacturer (providing an adequate warning or instruction to the medical community).  If the state law liability theory requires the manufacturer to do *more* than comply with the regulation to avoid liability, by definition it seeks to impose additional or different requirements than the predicate federal regulation.  Similarly, a claim is not on a "parallel" plane with the federal obligation if it needs to *intersect* with additional  behavior to result in liability.  Indeed, the notion that claims escape express preemption if they are framed by "parallel" federal requirements is actually a misnomer; to escape the reach of § 360k(a), the claims must also be of *equal length* to the federal requirements—*i.e.*, the requirements must be *identical*.  Here, however, the MDRs allegedly violated concern what manufacturers must disclose to *the FDA*.  The state law theory, in contrast, requires manufacturers to issue warnings *to physicians*.

In any event, because Defendant-Appellee Medtronic has fully and adequately briefed the express preemption question, PLAC does not further address those arguments here.

**B.    Implied Device Preemption**

   **1.    Even If a Claim is Not Expressly Preempted Under the MDA, it May Nevertheless be Impliedly Preempted.**

The Fifth Circuit Opinion in *Hughes*, and the panel dissent, suggest to varying degrees that *Riegel sub silentio* overruled *Buckman* and either eliminated or emasculated implied preemption in the device context.  *See Hughes*, 631 F.3d at 775; *Op.* at 4104.  This Court should reject that notion.

Even if a "parallel" state requirement survives express preemption, it may nonetheless be found impliedly preempted.  *See, e.g., Buckman*, 531 U.S. at 352 ("neither an express pre-emption provision nor a saving clause 'bars the ordinary working of conflict pre-emption principles'") (quoting *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869 (2000)); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (the argument "that implied pre-emption cannot exist when Congress has chosen to include an express pre-emption clause in the statute . . . is without merit").  That *Buckman* preceded *Riegel* is of no moment; *Buckman* followed *Lohr*, and expressly recognized that some "parallel" claims would be preempted.  *See Buckman*, 531 U.S. at 353 ("although [*Lohr*] can be read to allow certain state-law causes of actions that parallel federal safety requirements, it does nor and cannot stand for the proposition that any violation of the FDCA will support a state-law

claim.").  And nothing in *Riegel* announced or implied any retreat from the holding in *Buckman*.[3]

### 2.    Implied Preemption Under *Buckman*

In *Buckman*, plaintiffs alleged state law "fraud-on-the-FDA" claims following the FDA's § 510(k) approval of bone screws.  Plaintiffs alleged an agent of the manufacturer fraudulently represented to the FDA the screws would be used on arm and leg bones, but intended the screws for use in the spine.  As characterized by the Supreme Court, plaintiffs asserted state law tort claims based on the premise:  "Had the representations not been made, the FDA would not have approved the devices, and plaintiffs would not have been injured."  531 U.S. at 343.

---

[3] This undermines the panel dissent's characterization of the panel majority as eliminating any potential state law claim tort claim against a manufacturer of a medical device, and its related observation, that because "the Supreme Court has twice interpreted the MDA and held states may provide a damages remedy . . ., it would be 'strange' if the Court expressly preserved state remedies from preemption but believed such remedies were implicitly rejected by the statute." *Op.* at 4104.  To the contrary:

> *Riegel* and *Buckman* create a narrow gap through which a plaintiff's state-law claim must fit if it is to escape express or implied preemption.  The plaintiff must be suing for conduct that *violates* the FDCA (or else his claim is expressly preempted by § 360k(a)), but the plaintiff must not be suing *because* the conduct violates the FDCA (such a claim would be impliedly preempted under *Buckman*).

*In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200, 1204 (8th Cir. 2010) (emphasis in original) (quoting *Riley v. Cordis Corp.*, 625 F. Supp. 2d 769, 777 (D. Minn. 2009)).

The Supreme Court noted that the relationship between the FDA and the companies it regulates "is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law"—the MDA.  *Id.* at 347.  Accordingly, there could be "no presumption of preemption" as the states have never occupied the field of "policing fraud against federal agencies."  *Id.* at 347-48.  The Court catalogued the litany of powers the FDA has at its disposal for "detecting, deterring, and punishing false statements" made to the FDA (*id.* at 349), concluding that the "federal statutory scheme amply empowers the FDA to punish and deter fraud against the Agency to achieve a somewhat delicate balance of statutory objectives."  *Id.* at 348; *see also id.* at 349 ("The FDA thus has at its disposal a variety of enforcement options that allow it to make a measured response to suspected fraud upon the Agency."); *id.* (finding the FDA's enforcement "flexibility is a critical component of the statutory and regulatory framework under which the FDA pursues difficult (and often competing) objectives").  The Court held that allowing state law claims based on deceiving the FDA could disrupt or "skew" this balance by, for example:  (i) increasing burdens on prospective applicants who may over-disclose and over-submit for fear of future civil liability; (ii) taxing or overwhelming the resources of the FDA due to unnecessarily voluminous approval applications; (iii) delaying the processing of applications and approval of new devices; and (iv) an overall deterrence of off-label uses (which are nonetheless common and generally

accepted medical practices) by claims premised on FDA reporting requirements. *Id.* at 348, 350-51; *see also id.* at 350 (concluding that "state-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Agency's judgment and objectives.").

The Court concluded by distinguishing cases relied on by the plaintiff-respondent, *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984), and *Medtronic, Inc. v. Lohr*, 518 U.S. 470. Both involved claims based "on traditional state tort law principles;" in *Silkwood*, the duty owed by an employer to its employee, and in *Lohr*, basic product liability duties to manufacture a product with reasonable care. *Buckman*, 531 U.S. at 352-353. In contrast, "the fraud claims [in *Buckman*] exist solely by virtue of the FDCA disclosure requirements." *Id.* at 353. The claims did not rely on any "traditional state tort law which had predated the federal enactments;" rather, the existence of these federal enactments was "a critical element in their case." *Id.* The Court concluded that "this sort of litigation would exert an extraneous pull on the scheme established by Congress, and it is therefore preempted by that scheme." *Id.* Therefore, the claims were impliedly preempted under the MDA. *Id.* at 344, 348, 353.

**C.     This Court Should Hold That State Law Failure to Warn Claims Premised on Violations of Federal Reporting Obligations are Preempted by *Buckman*.**

**1.     The Stengels' Claims Based on Violations of MDR Requirements Exist Solely by Virtue of Those Requirements.**

The *Stengel* panel concluded that state law failure to warn claims premised on a manufacturer's violation of FDA reporting requirements, like those alleged by the Stengels, are legally indistinguishable from the alleged deceptive conduct claims found preempted in *Buckman*:

> The Stengels' theory is that if Medtronic had acted with reasonable care in complying with the regulations that required it to provide information to the FDA, the FDA would have required Medtronic to warn physicians about the danger of inflammation connected to its pump and Stengel could have avoided the injury caused by the pump. *See* 21 U.S.C. § 360h(a). This is precisely the same theory that was rejected in *Buckman*.

*Op.* at 4094.

As in *Buckman*, the Stengels' claims do not rely on any traditional state tort law theory which predated the MDRs; rather, the existence of the MDRs "is a critical element in their case." 531 U.S. at 353. Throughout the Complaint, the Stengels characterize the duties allegedly violated by Medtronic as arising under federal law. *See, e.g.,* Excerpts of Record, vol. 2, tab 4, p. 6, ¶13 ("Under federal law and regulation, Defendant was under a continuing duty to monitor the product after premarket approval and to discover and report to the FDA . . ."); *id.* at p. 11, ¶50 (same—negligence cause of action); *id.* at pp. 6-7, ¶¶12-16 (citing various federal statutes allegedly violated). The Complaint does not cite any state law.

Judge Noonan's dissent nevertheless asserts that the Stengels' claims "are traditional, free-standing tort claims" (*Op.* at 4105) and classifies the Stengels' claims as premised on a post-sale duty to warn existing in Arizona based on *Readenour v. Marion Power Shovel, Inc.*, 149 Ariz. 442, 448 (1986). *Op.* at 4106. Post-sale failure to warn claims, however, are not "traditional" state law theories, nor do they predate the MDA. But even assuming the dissent accurately characterized state law,[4] the posited post-sale duty to warn in Arizona runs between the manufacturer and *the consumer* (*i.e.*, physicians); there is certainly no post-sale duty to warn that runs between the manufacturer and *the FDA*. *See, e.g., Wilson v. United States Elevator Corp.*, 972 P.2d 235, 238-39, 256 (Ariz. Ct. App. 1998) (dismissing the post-sale duty to warn discussion in *Readenour* as dicta, but concluding Arizona recognizes a post-sale duty to warn between the manufacturer and consumer of the product); *see also, e.g., White v. Ford Motor Co.*, 312 F.3d 998, 1019 n.84-89 (9th Cir. 2002) (some states recognize a post-sale duty to warn, but in each the duty runs from the manufacturer to the ultimate consumer). Nor could there be, consistent with *Buckman*'s non-interference principle. Accordingly, the duty at the core of the Stengels' claims is not a traditional state

---

[4] It did not. *Readenour* dealt with a different point—interpretation of an Arizona statute prohibiting certain evidence of post-marketing remedial measures. *Readenour* no more "recognizes" a post-sale marketing claim than Federal Rule of Evidence 407 creates one.

law duty; rather, as in *Buckman*, "the existence of these federal enactments is a critical element in their case." *Buckman*, 531 U.S. at 353.

As the panel correctly noted, it is of no import that "in *Buckman*, the defendant allegedly misinformed the FDA overtly by providing false information, whereas here the defendant allegedly misinformed the FDA tacitly by failing to report information that it had a duty to report." *Op.* at 4094-95. This is undoubtedly correct: It is universally recognized that fraud can consist of either an affirmative misrepresentation or an omission of that which the speaker is duty-bound to disclose. The alleged false representation to the FDA concerning the actual intended use of the product in *Buckman* stands on essentially the same footing as the alleged failure to inform the FDA of post-marketing safety concerns alleged in *Stengel*. There is no meaningful distinction between these two species of fraud: "The policing of such conduct in both instances is committed exclusively to the federal government, and recognizing a state law cause of action based on such conduct would conflict with the statutory scheme established by Congress." *Id.* at 4095 (citing *Cupek v. Medtronic, Inc.*, 405 F.3d 421, 423-24 (6th Cir. 2005) (negligence per se claim due to "failure to comply with [FDA] conditions of approval" preempted as a "disguised fraud on the FDA claim")). The critical question is whether the state law theory alleged exists only because of the federal requirements; a claim predicated on an information transmission (or lack of one)

mandated by or under the MDA qualifies and is preempted under *Buckman* and

section 337(a).

### 2. State Attempts to Regulate the FDA/Entity Relationship Disrupt the "Delicate Balance" of the Federal Scheme.

As discussed above, the key concern of *Buckman* was that state law claims

predicated on MDA regulatory requirements would disrupt or "exert an extraneous

pull" on the "delicate balance" of the federal statutory scheme established by

Congress:

> [T]he federal statutory scheme amply empowers the FDA to punish
> and deter fraud against the Agency, and . . . this authority is used by
> the Agency to achieve a somewhat delicate balance of statutory
> objectives.  The balance sought by the Agency can be skewed by
> allowing fraud-on-the-FDA claims under state tort law.

531 U.S. at 348, 353.

"[T]he relationship between a federal agency and the entity it regulates is

inherently federal in character because the relationship originates from, is governed

by, and terminates according to federal law."  *Id.* at 348.  The FDA has a variety of

federal statutory mechanisms to punish and deter violations of the MDA, including

injunctive relief, civil penalties, seizing the device, and pursuing criminal

prosecutions.  *Id.* at 349.  The choice of whether, when, and in what measure to

employ its enforcement powers is a decision uniquely within the FDA's province,

and *Buckman's* purpose is to protect that sphere of authority.  In contrast,

"[p]olicing fraud against federal agencies is hardly 'a field which the States have

traditionally occupied,' such as to warrant a presumption against finding federal

- 19 -

preemption of a state-law cause of action." *Id.* at 348 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

The ability of the FDA to regulate its own relationship with manufacturers provides flexibility that "is a critical component of the statutory and regulatory framework under which the FDA pursues difficult (and often competing) objectives." *Id.* at 349. Were states permitted to regulate (or haphazardly influence) the relationships between manufacturers and the FDA, including policing reporting requirements and other federal duties, this would eliminate the FDA's exclusive control over the regulatory relationship. *Id.* at 350-51. *see also Lofton*, 672 F.3d at 380 (same). For these reasons, the *Buckman* majority concluded "[s]tate-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Agency's judgment and objectives," thereby causing an "extraneous pull" on the Congressional scheme. *Buckman*, 531 U.S. at 350, 353.

In his dissent to the panel opinion, Judge Noonan stated: "The Supreme Court [in *Buckman*] disparaged the notion of an 'extraneous pull' on the MDA. This reference to 'extraneous pull' was surely a make-weight. A dictum, it does not conform with *Lohr* or stand after *Riegel*. State damages do exert an additional pull for compliance with the MDA." *Op.* at 4104. But neither *Lohr* nor *Riegel* addressed implied preemption, and Judge Noonan misses the central point of the "delicate balance" the Supreme Court was protecting—that enforcement decisions

should be exclusively governed by the agency responsible for advancing the nuanced and often competing goals of public health on a case-by-case basis. *See Dowhal v. SmithKline Beecham Consumer Healthcare*, 32 Cal.4th 910, 935 (2004) (finding certain state law warnings preempted because FDA warning decisions further nuanced goals and conflict with a jury's "more single-minded goal of informing the consumer of risks"); *Riegel*, 552 U.S. at 325 ("A jury . . . sees only the cost of a more dangerous design, and is not concerned with its benefits; the patents who reaped those benefits are not represented in court."). Thus, even an "extraneous pull" which seems superficially to promote safety may pose a dangerous undertow beneath the surface and be incompatible with agency strategy. The point is, only the FDA can see the big picture and make decisions which promote overall health policy.

In any event, the "extraneous pull" notion is obviously neither make-weight nor dictum—the disruption of the fragile policy balance managed by the FDA among the various objectives implicated by device regulation was central to the Supreme Court's decision to insulate the FDA's enforcement discretion from the external, unpredictable influences of damages actions brought under the various tort standards of the 50 states. *See Buckman*, 531 U.S. at 350.

### 3. State Law Claims are Preempted by the MDA's "No Private Right of Enforcement" Provision.

The plain language of 21 U.S.C. § 337(a) demonstrates Congress' clear intent that the FDA alone have the authority to enforce obligations imposed by the

MDA, such as the MDR requirements, as the statute explicitly bars any private right of action.  *See Buckman*, 531 U.S. at 349 n.4 ("The FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with the medical device provisions:  'All such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States.'  21 U.S.C. § 337(a).").

The *Buckman* majority found the intent behind section 337(a) impliedly preempted plaintiffs' state law tort remedies premised on federal disclosure violations, as that section constitutes "*clear evidence* that Congress intended that the MDA be enforced exclusively by the Federal Government."  *Id.* at 352 (emphasis added).  Section 337(a)'s attempt to preclude private enforcement of the MDA is a key reason why state law claims that exist solely because of MDA requirements—and, therefore, effectively seek to enforce federal regulatory duties—are preempted.

Thus, state law tort claims attempting to or likely to intrude upon the federal scheme envisioned by Congress, like those proffered by the Stengels, conflict with the federal scheme envisioned by Congress, and implied preemption should apply.  *See also In re Medtronic*, 623 F.3d at 1204-06.

The States of Idaho, Montana, Nevada, Oregon, Washington, and the Office of Consumer Protection of Hawaii have submitted an Amicus Curiae Brief

Supporting Plaintiffs-Appellants.  *See* Dkt. 49.[5]  The position of these States

improperly conflates and confuses express and implied preemption principles.  The

Brief also argues at length the impact of the presumption against preemption—a

presumption that has no application to *Buckman* preemption, given the federal

nature of the regulatory scheme.  531 U.S. at 347-348.  In any event, although they

assert enforcement of consumer protection laws "parallel" MDA requirements,

Amici ignore that they have no greater standing to enforce the FDCA than do the

private litigants prohibited by section 337(a) in *Buckman*.

### 4.     Finding State Law Tort Claims Premised on Violations of Federal Reporting Obligations Impliedly Preempted Will Not Result in the Consequences Judge Noonan Predicts.

In his dissent to the panel opinion, Judge Noonan suggested the majority

decision would leave manufacturers free from liability, and injured consumers with

no remedy.  *Op.* at 4102.  These predictions are unwarranted and unsupported.  As

explained, Congress has vested the FDA with a variety of mechanisms to police

fraud and punish violations with MDA requirements, to wield as the FDA sees fit

in the overall and overriding interest of the public health.  *Buckman*, 531 U.S. at

349.  Moreover, true parallel claims under traditional state law theories which do

not seek to enforce federal requirements (such as the exchange of information with

the FDA) remain available.  But Judge Noonan's concerns ignore the policy

---

[5] This brief impermissibly raises consumer protection issues that were not raised by the parties to the appeal.

rationales central to *Buckman*, where the Supreme Court held a less-restrictive approach could derail key aspects of the MDA's regulatory process—a process designed to facilitate medical developments and approve medical devices for the patients who need them, as well as to reasonably assure safety and efficacy. *Id.* at 349-51.

In *Riegel*, the Supreme Court dismissed concerns similar to those voiced by Judge Noonan. For example, the Court observed that, during the PMA process, experts at the FDA regularly perform the cost-benefit analysis Judge Noonan feared would be eliminated by preemption of state law claims. *Riegel*, 552 U.S. at 318. But not precisely the same cost-benefit analysis. The Court distinguished the more detached, and comprehensive "cost-benefit analysis . . . applied by the experts at the FDA" from the more single-minded focus of a jury, which "sees only the cost of a more dangerous design, and is not concerned with its benefits." *Id.* at 325. Similarly, the Court recognized the very text of the MDA "suggests that the solicitude for those injured by FDA-approved devices, which the dissent finds controlling, was overcome in Congress's estimation by solicitude for those who would suffer without new medical devices if juries were allowed to apply the tort law of 50 States to all innovations." *Id.* at 326. As both Congress and the Supreme Court have recognized, "safety" is a far more complex equation than the comparatively simple determination of whether a device presented risks which are alleged to have caused injury in an isolated case. It is the FDA's ability to promote

this larger vision of "safety" that animated the Supreme Court in *Buckman* and likewise requires protection here.

**D.    This Court Should Adopt the Position of the Eighth Circuit and Reject the Analysis of the *Hughes* Decision.**

As the panel recognized, there is a circuit split on the application of *Buckman* to purportedly parallel claims based on MDR violations.  The Eighth Circuit held the MDA impliedly preempts state failure-to-warn claims based on a manufacturer's violation of MDR requirements.  *In re Medtronic*, 623 F.3d at 1204-06.  There, after Medtronic's PMA-approved defibrillator wire began giving patients "unnecessary shocks," plaintiffs asserted state law tort claims based on Medtronic's failure to timely report adverse events to the FDA and warn consumers of the problem.  The Eighth Circuit found these claims preempted pursuant to *Buckman* because they were "simply an attempt by private parties to enforce the MDA, claims foreclosed by § 337(a) . . . ."  *Id.*

The Fifth Circuit, on the other hand, is itself divided on how to read *Buckman*.  In *Hughes*, 631 F.3d at 775-76, plaintiff alleged Boston Scientific failed to report to the FDA or warn consumers of problems with its PMA-approved HydroThermAblator, designed for treatment of excess uterine bleeding.  The Fifth Circuit panel concluded that state law failure to warn claims premised on the manufacturer's failure to comply with federal reporting requirements were distinguishable from the claim asserted in *Buckman*.

The *Stengel* panel majority found *Hughes* unpersuasive. First, the panel found *Hughes* improperly relied upon the dicta in *Riegel* that parallel claims survive section 360k(a), thereby improperly conflating express and implied preemption principles. *Op.* at 4098-99. Second, the panel found *Hughes* erroneously interpreted *Buckman* as preempting state law claims that assert only a freestanding federal cause of action. *Id.* In fact, the *Buckman* plaintiffs sought damages "'*under state tort law*.'" *Op.* at 4098 (emphasis added) (quoting *Buckman*, 531 U.S. at 343). And third, the panel found *Hughes* erroneously followed Justice Stevens' *Buckman* concurrence (rejected by the *Buckman* majority), which argued that the existence of an FDA warning letter to Boston Scientific preserved Hughes' state law claims because it meant the claim did not second-guess the FDA. The panel reasoned that this is not a meaningful basis to distinguish *Buckman*, because the Supreme Court's rationale was multi-faceted. "The *Buckman* majority's rationale, unlike the concurrence's, was not solely based on a desire to avoid jurors second-guessing the FDA's decision making . . . ." *Op.* at 4097-99.[6] These flaws in the reasoning employed by the Fifth Circuit in *Hughes* render it unpersuasive and deserving of little weight.

_____

[6] Judge Noonan's argument that the existence of a subsequent warning letter from the FDA meant the jury would not "second-guess" the FDA is also short-sighted for other reasons. First, a warning letter is not final and reviewable agency action; rather, it is tentative and preliminary action to initiate a dialogue between the agency and the manufacturer and facilitate voluntary resolution. *See, e.g., Biotics Research Corp. v. Heckler*, 710 F.2d 1375, 1378 (9th Cir. 1983); *Dietary*

(Continued)

Moreover, in February 2012, another panel of the Fifth Circuit read *Buckman* quite differently and found preemption applied to bar a Texas statute to the extent it supported liability for failure to warn if the plaintiff could prove that the FDA had been misled. *Lofton*, 672 F.3d at 373. The statute mandated a presumption of adequacy of the label, if FDA approved, except where material information was withheld from the FDA. The District Court found the exception barred by *Buckman*. The *Lofton* panel acknowledged the Sixth and Second Circuits were split on whether *Buckman* applied to defenses or statutory exceptions, as opposed to affirmative tort claims for fraud on the FDA. *Id.* at 375 (citing *Garcia v. Wyeth-Ayerst Labs.*, 385 F.3d 961 (6th Cir. 2004) (finding statute preempted under *Buckman*) and *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85 (2d Cir. 2006) (finding statute not preempted under *Buckman*), *aff'd by an equally*

---

(Continued)

*Supplemental Coalition, Inc. v. Sullivan*, 978 F.2d 560, 563 (9th Cir. 1992). Withholding preemption based on issuance of a warning letter or a subsequent recall would therefore run afoul of the agency's intent, (ironically) interfere with FDA enforcement discretion, and disrupt the delicate balance it seeks to achieve by altering the calculus of the manufacturer's decision on whether to comply with or fight the FDA's proposed agency action. Second, the issuance of a warning letter does not necessarily mean that a jury will not be second-guessing the FDA. Indeed, here, the warning letter is *not* consistent with the ultimate requirements Plaintiffs seek to impose under Arizona law. The FDA cited Medtronic for taking unilateral action *to provide* additional risk information to the medical community without prior approval; Plaintiffs' theory ultimately seeks to require disclosure to physicians of additional risk information of the type Medtronic was cited for providing. On these facts, counter-intuitively, Plaintiffs *would* seem to be second-guessing the FDA's action.

- 27 -

*divided court sub nom. Warner-Lambert Co., LLC v. Kent*, 552 U.S. 440 (2008)).

Evaluating the policy considerations set forth in *Buckman*, the Fifth Circuit panel

adopted an instrumental approach and concluded, "[w]hile *Desiano* strains to

evoke distinctions between the claim in *Buckman* and the Michigan statute, the

Sixth Circuit's approach is more faithful to *Buckman*." *Id.* at 380. Thus, the Fifth

Circuit panel in *Lofton* found the state law failure to warn claims were preempted

for "intrud[ing] upon the competency of the FDA and its relationship with

regulated entities." *Id.* While the issues in *Lofton* and *Hughes* were not identical,

their readings of *Buckman* cannot be reconciled, and *Lofton* highlights the flawed

nature of the reading of *Buckman* taken in *Hughes*. *Hughes* thus lacks support

even in its own circuit. There is no persuasive reason to adopt it in this one.

The *Stengel* panel's reading of *Buckman* is consistent with the well-

reasoned decision of the Eighth Circuit, while the panel dissent's narrow and

flawed reading of *Buckman* is supported only by the equally flawed *Hughes*

opinion. This Court should endorse the Eighth Circuit and *Stengel* panel's more

persuasive interpretation.

## CONCLUSION

State law failure to warn claims premised on a violation of federal reporting

regulations should be found impliedly preempted pursuant to *Buckman*. These

claims implicate the same policy considerations that influenced the *Buckman*

Court—namely, treading on the "delicate balance" established by Congress and

FDA by allowing state involvement in policing the relationship between the FDA and the entities it regulates, intruding upon FDA decision-making by refusing to protect the FDA's ability to regulate the MDA in the manner it deems appropriate, and overwhelming the regulatory process by inducing applicants to over-submit and over-disclose for fear of incurring state tort liability. The MDA was designed as an exclusively federal regime, and the FDA is meant to govern all aspects of the process.

For all of these reasons, this Court should affirm.

Respectfully submitted,

Dated: August 29, 2012

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235

By:    /s/ Alan J. Lazarus

Alan J. Lazarus
Sally F. White

**OF COUNSEL:**
Hugh F. Young, Jr.
Product Liability Advisory Council, Inc.
1850 Centennial Park Drive
Suite 501
Reston, VA 20191
(703) 264-5300

Counsel for *Amicus Curiae* Product Liability Advisory Council, Inc.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the length limits set forth at Fed. R.

App. P. 29(d) and 32, and contains 6,696 words.  The brief's size and type face

comply with Fed. R. App. P. 32(a)(5)-(6).


Dated:  August 29, 2012                     DRINKER BIDDLE & REATH LLP
                                            50 Fremont Street, 20th Floor
                                            San Francisco, CA  94105-2235


                                            By:     /s/  Alan J. Lazarus
                                               Alan J. Lazarus
**OF COUNSEL:**                                Sally F. White
Hugh F. Young, Jr.
Product Liability Advisory Council, Inc.    Counsel  for *Amicus Curiae* Product
1850 Centennial Park Drive                  Liability Advisory Council, Inc.
Suite 501
Reston, VA 20191
(703) 264-5300

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2012, I electronically filed the attached Amicus Curiae Brief of the Product Liability Advisory Council, Inc. with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CMF/ECF system.  All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 29, 2012, at San Francisco, California.

/s/ Connie Gutierrez
Connie Gutierrez

# APPENDIX A

# Corporate Members of the
# Product Liability Advisory Council

as of 8/7/2012

Total: 100

| | |
|---|---|
| 3M | General Motors Corporation |
| Altec, Inc. | GlaxoSmithKline |
| Altria Client Services Inc. | The Goodyear Tire & Rubber Company |
| Astec Industries | Great Dane Limited Partnership |
| Bayer Corporation | Harley-Davidson Motor Company |
| BIC Corporation | Honda North America, Inc. |
| Biro Manufacturing Company, Inc. | Hyundai Motor America |
| BMW of North America, LLC | Illinois Tool Works Inc. |
| Boehringer Ingelheim Corporation | Isuzu North America Corporation |
| The Boeing Company | Jaguar Land Rover North America, LLC |
| Bombardier Recreational Products, Inc. | Jarden Corporation |
| BP America Inc. | Johnson & Johnson |
| Bridgestone Americas, Inc. | Johnson Controls, Inc. |
| Brown-Forman Corporation | Kawasaki Motors Corp., U.S.A. |
| Caterpillar Inc. | Kia Motors America, Inc. |
| CC Industries, Inc. | Kolcraft Enterprises, Inc. |
| Chrysler Group LLC | Lincoln Electric Company |
| Cirrus Design Corporation | Lorillard Tobacco Co. |
| CLAAS of America Inc. | Magna International Inc. |
| Continental Tire the Americas LLC | Marucci Sports, L.L.C. |
| Cooper Tire & Rubber Company | Mazak Corporation |
| Crown Cork & Seal Company, Inc. | Mazda Motor of America, Inc. |
| Crown Equipment Corporation | Medtronic, Inc. |
| Daimler Trucks North America LLC | Merck & Co., Inc. |
| Deere & Company | Meritor WABCO |
| The Dow Chemical Company | Michelin North America, Inc. |
| E.I. duPont de Nemours and Company | Microsoft Corporation |
| Emerson Electric Co. | Mine Safety Appliances Company |
| Engineered Controls International, LLC | Mitsubishi Motors North America, Inc. |
| Estee Lauder Companies | Mutual Pharmaceutical Company, Inc. |
| Exxon Mobil Corporation | Navistar, Inc. |
| FMC Corporation | Niro Inc. |
| Ford Motor Company | Nissan North America, Inc. |
| General Electric Company | Novartis Pharmaceuticals Corporation |

# Corporate Members of the
# Product Liability Advisory Council
as of 8/7/2012

PACCAR Inc.

Panasonic Corporation of North America

Pella Corporation

Pfizer Inc.

Pirelli Tire, LLC

Polaris Industries, Inc.

Porsche Cars North America, Inc.

Purdue Pharma L.P.

Remington Arms Company, Inc.

RJ Reynolds Tobacco Company

Schindler Elevator Corporation

SCM Group USA Inc.

Shell Oil Company

The Sherwin-Williams Company

Smith & Nephew, Inc.

St. Jude Medical, Inc.

Stanley Black & Decker, Inc.

Subaru of America, Inc.

Techtronic Industries North America, Inc.

Teva Pharmaceuticals USA, Inc.

Thor Industries, Inc.

TK Holdings Inc.

The Toro Company

Toyota Motor Sales, USA, Inc.

Vermeer Manufacturing Company

The Viking Corporation

Volkswagen Group of America, Inc.

Volvo Cars of North America, Inc.

Whirlpool Corporation

Yamaha Motor Corporation, U.S.A.

Yokohama Tire Corporation

Zimmer, Inc.